Filed 3/3/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076549 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1602869) |
| RENE QUINTANILLA, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge. Reversed and remanded.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Rene Quintanilla, Jr., of one count of first degree murder (Pen. Code, §§ 187, subd. (a), 189), one count of possession of a firearm by a prohibited person

(*id*., § 29815), and one count of child abuse likely to produce great bodily harm or death (*id*., § 273a, subd. (a)).[1]  For the murder count, the jury further found that Quintanilla intentionally and personally discharged a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).)  The trial court sentenced Quintanilla to prison for an indeterminate term of 50 years to life, consecutive to a determinate term of six years.

Quintanilla contends that the trial court made several prejudicial errors in the admission of evidence during trial.  First, he contends that the trial court erred in concluding that the murder victim's out-of-court statements were admissible pursuant to Evidence Code section 1390 based on a finding, after a foundational in limine hearing, that Quintanilla killed the victim, at least in part, to prevent her from being a witness against him.  According to Quintanilla, the evidence at the in limine hearing did not support such a finding.  Second, Quintanilla contends that the trial court erred in concluding that certain items of character evidence were admissible as prior instances of domestic violence under Evidence Code section 1109.  Finally, Quintanilla contends that the trial court should have excluded testimony from an expert witness regarding the effects of pregnancy on domestic violence.  In addition to his evidentiary challenges, Quintanilla argues for reversal based on the prosecutor's alleged misconduct in adducing testimony regarding the witnesses' opinions regarding Quintanilla's relationship with the victim that the trial court excluded from evidence during an in limine hearing.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

We conclude that the trial court prejudicially erred in admitting the victim's out-of-court statements pursuant to Evidence Code section 1390. Accordingly, although this case involves a horrific and tragic killing, we conclude that the trial court's erroneous evidentiary rulings require us to reverse the judgment and to remand for further proceedings.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Quintanilla and his girlfriend Charlene[2] lived together in the home of Quintanilla's mother and stepfather together with Charlene's four-year-old daughter (the Child). Charlene and Quintanilla started dating and living together in 2015.

Around 2:00 a.m. on June 5, 2016, a sheriff's deputy responded to a series of 911 calls from Quintanilla, in which he falsely reported a car accident and then a burglary. When the deputy arrived at Quintanilla's residence, Quintanilla's mother stated that the Child told her that Quintanilla had killed the Child's mother. Quintanilla then spoke to the deputy, stating that he was a drug user and he had shot or killed Charlene, who was in the downstairs bedroom.[3] Quintanilla also stated that child protective services should be

---

[2]     In the interest of preserving the privacy of crime victims and their families, we refer to Charlene solely by her first name. Similarly we refer to witnesses by their first names or other nonspecific descriptions to preserve their privacy. We intend no disrespect by doing so.

[3]     The deputy could not remember whether Quintanilla said that he shot Charlene or that he killed Charlene.

3

called for the Child "because she saw a lot," and he explained that the shotgun used in the shooting was located on the side of the house.[4]

Charlene's body was found lying on a bed in the downstairs bedroom, with a single gunshot wound to her chest and blood splatter in the room. The gun used in the shooting was a large 12-gauge pump action shotgun, which requires a user to pump it to load a round into the chamber.[5] The shot entered Charlene's upper right chest and travelled upward and to the left. The forensic pathologist who conducted the autopsy concluded that Charlene was likely shot from a distance of five to 10 feet. An expended 12-gauge casing from the gun had been manually expelled onto the bed near Charlene. Based on reports of a possible gunshot sound from a neighbor and the state of Charlene's body when deputies arrived, the shooting likely occurred late on the evening of June 3, 2016, which was more than 24 hours before Quintanilla started to make the 911 calls that eventually brought law enforcement officers to the property.

Although the details of the Child's involvement during the shooting were unclear because of her limited ability to describe the incident, the Child was apparently in the bedroom at the time and may have been on the bed next to Charlene. Shortly after the shooting, the Child was interviewed by a child forensic interviewer and stated that Quintanilla got a "big gun" and shot her mother.

---

[4]     Sheriff deputies found the shotgun outside where Quintanilla specified. It was loaded with a round in the chamber.

[5]     An expert examined the shotgun and found that it functioned normally, including its safety mechanism.

Quintanilla was charged with murder (§ 187, subd. (a)), possession of a firearm by a prohibited person (§ 29815), and child abuse likely to produce great bodily harm or death (§ 273a, subd. (a)). It was also alleged with respect to the murder count, that Quintanilla intentionally and personally discharged a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).)

Prior to trial, the court considered and granted the People's in limine motion to admit out-of-court statements that Charlene made to friends and family members describing Quintanilla's domestic violence toward her over the course of their relationship. In deciding to admit the evidence, the trial court heard testimony from six witnesses to determine whether the hearsay exception in Evidence Code section 1390 applied, under which "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." (Evid. Code, § 1390, subd. (a).) After hearing the testimony, the trial court concluded that the evidence supported an inference that Quintanilla killed Charlene, at least in part, to prevent her from "testifying" or " saying anything at all about" the domestic violence he had inflicted on her. Accordingly, the trial court admitted all of Charlene's out-of-court statements under section 1390 without considering whether any other exceptions to the hearsay rule might also be applicable.

At trial, the jury heard testimony about several incidents of domestic violence perpetrated by Quintanilla on Charlene and on a previous girlfriend, which the trial court

5

determined was admissible under Evidence Code section 1109.[6] Some of the testimony regarding Quintanilla's domestic violence toward Charlene was based on Charlene's hearsay statements to friends and family, which the trial court determined to be admissible under Evidence Code section 1390, but some of it was based on those witnesses' own observations of Charlene's injuries.

The first witness to testify about the domestic violence was Charlene's aunt (Aunt), who lives in Utah. Aunt testified that in November 2015, Charlene and the Child moved into her house in Utah to start a new life and get away from an abusive relationship.

While in Utah, Charlene told Aunt about flashbacks she was having at night about Quintanilla's domestic violence. First, Charlene described two instances in which Quintanilla strangled her. One strangulation was with a belt around her neck, causing Charlene to black out and lose consciousness. Charlene was rescued by Quintanilla's stepfather who intervened and released her. The second strangulation was with Quintanilla's hands, and Charlene did not lose consciousness. Next, Charlene told Aunt that Quintanilla tied her to a chair in a garage or shed and put duct tape on her mouth and a bag over her head. Quintanilla then poured gasoline on Charlene and lit a lighter. Charlene was rescued when the Child went to get Quintanilla's mother, who intervened.

---

6     Evidence Code section 1109, subdivision (a)(1) provides that, with certain exceptions, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

6

Charlene stated she was scared and thought she was going to die. Finally, Charlene told Aunt about other injuries that Quintanilla inflicted on her, consisting of black eyes, pulling out her hair, a broken nose, and bruises on her body, including one time when Quintanilla pinned her against a wall and was hitting her.

Charlene stayed in Utah approximately two and half months, until she reunited with Quintanilla and moved back to California. Charlene told Aunt that she thought Quintanilla had changed and everything would be different. After Charlene returned to California with Quintanilla, Aunt spoke with her on the phone. One time, Charlene was crying and upset, and told Aunt that Quintanilla was kicking her out of the house. Aunt heard arguing between Charlene and Quintanilla while on the phone. After she returned to California, Charlene also told Aunt that she was pregnant with twins, and later told Aunt that she had lost the pregnancy.

The second witness who testified about Quintanilla's perpetration of domestic violence was Charlene's friend Maria. Maria testified that Charlene came to her house to stay with her on three separate occasions when Quintanilla had abused her. One time, Charlene arrived with two black eyes and a crooked nose. Charlene told Maria that Quintanilla hit her with his fists because he was upset with her, and that her nose was broken. Another time, Charlene arrived in her pajamas, wearing no shoes, crying, and stating that Quintanilla had strangled her in their bedroom. Charlene stated that during the strangling she was scared, could not breath and felt like she was going to pass out. Maria saw red marks on both sides of Charlene's neck. On both occasions, Charlene put her car in Maria's backyard so Quintanilla would not know she was there. Maria did not

7

have specific details about the third incident when Charlene came to stay with her, other than that Charlene said Quintanilla was being abusive.

The third witness who testified about the domestic violence was Charlene's friend Andrea. Andrea saw bruises on Charlene's arm that looked like they were caused by pressure from fingertips, but Charlene did not explain how she got them. On another occasion, Andrea ran into Charlene at a convenience store and saw that Charlene had bruising on her nose that she was hiding with dark glasses. A few weeks later, Charlene later told Andrea that the injury occurred during an argument with Quintanilla when he broke her nose. Charlene told Andrea other things about Quintanilla's abuse, which Andrea described at trial. Specifically, Charlene said that when she was intimate with Quintanilla, he would put a pillow over her face so he couldn't see her and would criticize her body. On multiple occasions, Charlene told Andrea that Quintanilla had put his hands around her neck. Charlene stated that she had a miscarriage because, when Quintanilla knew she was pregnant, he hit or pushed her in the stomach, requiring her to go to the hospital. According to Charlene, Quintanilla would sometimes force her to use illegal drugs. Charlene stated that Quintanilla would destroy her personal property, such as pouring bleach on her clothes and purse when he was angry and breaking her phone. Charlene told Andrea that Quintanilla had a lot of guns around the house and would bring guns into their bedroom to use in an emergency.

The fourth witness who testified about domestic violence was Charlene's sister (Sister). Sister twice saw injuries on Charlene. One time, when Charlene was not responding to attempts to contact her by phone, Sister went to the house where Charlene

8

and Quintanilla lived and stayed outside the gate, honking and flashing her lights for a long time until the gate was opened. When Charlene came to the gate, Sister saw that Charlene's face was swollen and her nose was crooked. Charlene said that Quintanilla hit her and that he would not let Charlene open the gate because Sister would see the injuries to her face. Another time, Sister saw a mark on Charlene's back, which was bruised and looked like a mark from a knife. Charlene stated that Quintanilla caused the mark by trying to stab her with a knife when they were arguing, and she felt scared for her life. Charlene also told Sister about the incident in which Quintanilla tied her up, put a bag over her head, poured gasoline on her, and was going to "light her up" when Quintanilla's mother intervened. Sister also confirmed that Charlene was pregnant with twins but had miscarried, as Sister accompanied Charlene to the doctor in connection with the miscarriage.

Next, Charlene's mother (Mother) testified about an incident of domestic violence. According to Mother, Charlene came to stay with her because, according to Charlene, Quintanilla had strangled her with a belt around her neck. Charlene reported that she was able to escape the strangling when Quintanilla's stepfather intervened. Mother observed that Charlene had a red mark on her neck, and that Charlene was complaining that her throat hurt.

The Child also testified at trial about an incident of domestic abuse. Although the Child was six years old during the trial and her testimony was accordingly somewhat disjointed, the Child was able to describe her personal observations during an incident in which Quintanilla tied up Charlene. The Child stated that "[a] long time ago" "I went to

9

the room and I saw the tape on my mom's mouth, and he had tied up her with ropes on her legs." The Child stated, "And I tried to get the tape, but he tied it around her back like arrest," and "[h]e put tape on her hands and it hurt, and she had a bruise and she put cream on her." About the tape, the Child said "I tried to take it off, but he didn't let me." The Child testified that she told Quintanilla's parents "that he tied the ropes," and that Quintanilla's parents then "slapped him" and untied Charlene.

The final witness to testify about Quintanilla's domestic violence was his former girlfriend and mother of his two children. According to the former girlfriend, Quintanilla was verbally and emotionally abusive, and engaged in physical violence toward her or toward inanimate objects on a "few" occasions, including four or five times when she called the police. One time, when Quintanilla was angry at her, he ripped the kitchen cabinets off the wall and stabbed them. Once, during an argument in the car, Quintanilla punched the former girlfriend's head, giving her black eyes and welts on her head. On another occasion, Quintanilla broke down a bedroom door and ripped the former girlfriend's purse off her arm, breaking the purse strap and leaving a mark on the former girlfriends shoulder. Finally, the former girlfriend testified that Quintanilla owned guns, and she described an incident in which Quintanilla, who had been holding their daughter, pulled a gun from his pants after learning that someone was at the gate asking for him.

At trial, other than forensic evidence and the limited descriptions that the Child was able to provide, there was sparse evidence of what occurred between Quintanilla and Charlene on the night of the shooting. In closing, defense counsel argued that because of

10

the uncertainty as to why and how the shooting occurred, the People did not meet their burden to prove the elements of either first degree or second degree murder.

The jury found Quintanilla guilty of first degree murder (§§ 187, subd. (a), 189) along with the other two counts (§§ 29815, 273a, subd. (a)), and it made a true finding on the gun use enhancement for the murder count (§ 12022.53, subd. (d)). The trial court imposed an indeterminate sentence of 50 years to life, consecutive to a determinate term of six years.

## II.

## DISCUSSION

A.   *The Trial Court Abused Its Discretion In Admitting Charlene's Out-of-Court Statements Pursuant to Evidence Code § 1390 Because Substantial Evidence Does Not Support the Trial Court's Finding That Quintanilla Killed Charlene, In Part, to Make Her Unavailable as a Witness*

We first consider Quintanilla's contention that the trial court prejudicially erred by determining, after holding a foundational in limine hearing, that Charlene's out-of-court statements to friends and family were admissible pursuant to Evidence Code section 1390.

1.   *Applicable Legal Standards*

" ' "Hearsay evidence" is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).) 'Except as provided by law, hearsay evidence is inadmissible.' (*Id.*, subd. (b).)" (*People v. Henriquez* (2017) 4 Cal.5th 1, 31.) Evidence Code section 1390 outlines an exception to the hearsay rule for statements that are

11

offered against a party involved in causing the unavailability of the declarant as witness. That section, which was enacted in 2010 (Stats. 2010, ch. 537 (Assem. Bill No. 1723), § 2) provides, in relevant part:

> "(a) Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.
>
> "(b)(1) The party seeking to introduce a statement pursuant to subdivision (a) shall establish, by a preponderance of the evidence, that the elements of subdivision (a) have been met at a foundational hearing.
>
> "(2) The hearsay evidence that is the subject of the foundational hearing is admissible at the foundational hearing. However, a finding that the elements of subdivision (a) have been met shall not be based solely on the unconfronted hearsay statement of the unavailable declarant, and shall be supported by independent corroborative evidence.
>
> "(3) The foundational hearing shall be conducted outside the presence of the jury. However, if the hearing is conducted after a jury trial has begun, the judge presiding at the hearing may consider evidence already presented to the jury in deciding whether the elements of subdivision (a) have been met.
>
> "(4) In deciding whether or not to admit the statement, the judge may take into account whether it is trustworthy and reliable." (Evid. Code, § 1390.)

Case law has subsequently clarified that Evidence Code section 1390 is satisfied by a finding that *at least one* of the defendant's reasons for committing the wrongdoing that made the declarant unavailable was to make the declarant unavailable as a witness, although the defendant may also have had other reasons for the wrongdoing. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 558 (*Kerley*) ["Kerley may have had additional motives for killing [the declarant]. The question, however, is whether the evidence showed by a preponderance that preventing [the declarant] from either reporting his

12

assaults to the police or testifying against him in the pending domestic violence case was one of Kerley's motives for killing [the declarant]; it need not have been his only reason."].)

In general, "[w]e review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) However, when the admission of evidence "depend[s] on a determination of preliminary facts by the trial court[,] such determinations will be upheld if supported by substantial evidence." (*People v. Brown* (2003) 31 Cal.4th 518, 540-541 [addressing preliminary factual finding under the spontaneous statement exception to the hearsay rule in Evid. Code, § 1240].) Thus in this case, where the central disputed issue is whether the trial court erred in finding that a defendant engaged in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness, we apply a substantial evidence standard in reviewing the trial court's finding regarding the defendant's intent. (See *Kerley*, *supra*, 23 Cal.App.5th at p. 559 ["[s]ubstantial evidence supports the trial court's implied finding that Kerley murdered [the declarant] at least in part to keep her from . . . testifying against him"]; *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1186 [in reviewing a finding of forfeiture by wrongdoing under the Confrontation Clause, "[w]e evaluate whether there is sufficient evidence from which the trial court could make its finding on a preponderance standard"].) Although we apply a substantial evidence standard of review to the trial court's factual finding, "[w]e review for abuse of discretion the ultimate decision whether to admit the evidence." (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

13

Although the parties are in agreement that this case does not involve any testimonial out-of-court statements that would implicate the Confrontation Clause of the Sixth Amendment to the United States Constitution,[7] we note that a similar legal standard to Evidence Code section 1390 applies when a court determines whether a declarant's out-of-court testimonial statements subject to the Confrontation Clause may be admitted under the forfeiture by wrongdoing doctrine. Under the forfeiture by wrongdoing doctrine, a defendant forfeits his Sixth Amendment right to confront a witness against him when, by a wrongful act, the defendant makes the witness unavailable to testify at trial. (*Giles v. California* (2008) 554 U.S. 353, 355 (*Giles*).) As is the case with evidence admitted under Evidence Code section 1390, unconfronted testimony will not be admitted under the forfeiture by wrongdoing doctrine "without a showing that the defendant *intended* to prevent a witness from testifying." (*Giles*, at p. 361, italics added.) Thus, under both the forfeiture by wrongdoing doctrine and Evidence Code section 1390, it is not sufficient that the defendant *caused* the declarant to be unavailable; the defendant must also have *intended* that result when engaging in the wrongdoing that caused the unavailability. Because of the similarity of the legal

_____

[7] "[I]n general, admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1214.) " '[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial' . . . —that is to say, unless the statements are given in the course of an interrogation or other conversation whose ' "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." ' " (*Ibid*., citations omitted.)

14

standards, case law developed under the forfeiture by wrongdoing doctrine is helpful in applying Evidence Code section 1390.

As relevant here, the Supreme Court in *Giles* addressed application of the forfeiture by wrongdoing doctrine to domestic violence cases: "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (*Giles*, *supra*, 554 U.S. at p. 377.)

2. *Testimony at the Foundational Hearing*

Prior to trial, the People filed an in limine motion to admit into evidence certain out-of-court statements that Charlene made to friends and family. Although the People's motion cited several exceptions to the hearsay rule as grounds for admission of the various out-of-court statements,[8] the trial court determined that instead of addressing each statement on an individual basis, it would be more efficient to hold a foundational

---

[8]    Specifically, the People cited Evidence Code sections 1240, 1241, 1250, 1251 and 1390 as a basis for admissibility of the various out-of-court statements.

15

hearing to determine whether the statements, collectively, fell under the hearsay exception set forth in Evidence Code section 1390. Accordingly, the trial court held a foundational hearing to determine whether Quintanilla "engaged . . . in the wrongdoing that was intended to, and did, procure the unavailability of [Charlene] as a witness." (Evid. Code, § 1390, subd. (a).) As the trial court noted, there was no dispute that Quintanilla shot and killed Charlene, and thus made her unavailable as a witness. The issue in dispute was whether, as required by Evidence Code section 1390, when Quintanilla shot and killed Charlene, he acted with the *intent* to "procure [her] unavailability . . . as a witness." (Evid. Code, § 1390, subd. (a).) Six witnesses testified at the foundational in limine hearing.

First, Charlene's friend Maria testified to the same specific domestic violence incidents she later described at trial: (1) the time Charlene came to Maria's house with red marks on her neck and stated that she had been strangled; and (2) the time Maria saw Charlene with black eyes and a broken nose. Maria also testified about things that Quintanilla did to control Charlene, such as not allowing her to use the phone and not letting her leave the house by herself. According to Maria, Charlene stated multiple times that she thought Quintanilla was going to kill her. Charlene also said that she didn't report the abuse to the police because if Quintanilla went to jail, he would come out and hurt her worse. Maria testified that when Charlene came to her house after the strangling incident, she persuaded Charlene to call the police, who escorted Charlene to collect her belongings from Quintanilla's house.

16

Second, Aunt testified about some of the domestic violence incidents that Charlene told her about while staying in Utah. Specifically, Aunt testified that Charlene told her that Quintanilla (1) strangled her with a belt; (2) tried to light her on fire after tying her up, covering her with gasoline and putting a bag on her head; and (3) caused her to have black eyes and a broken nose. Aunt testified that Charlene said she was scared for her life, and that she didn't go to the police because she loved Quintanilla. Aunt also described the time after Charlene left Utah when she called Aunt because Quintanilla was kicking her out of the house and "being really abusive."

Third, Charlene's friend Andrea testified about the two physical injuries she observed on Charlene that Andrea later described at trial: (1) Charlene's broken and bruised nose; and (2) the fingerprint bruises on Charlene's arms. Andrea also testified that Charlene told her that Quintanilla had (1) destroyed her personal property and phones; (2) had pulled a gun on her and the Child; and (3) wouldn't let her leave the house or stay away for long periods of time.

Fourth, Sister described the incident in which she went over to the house where Charlene was living with Quintanilla and had to honk and flash her lights for an hour before Charlene opened the gate, revealing a broken nose and black eyes. Sister testified that Charlene stated Quintanilla did not want her to open the gate because Sister would see the injury to Charlene's face, and Charlene did not want to go to the hospital because she was afraid the hospital would call the police to report Quintanilla. Sister also testified about Charlene's statements that Quintanilla had tried to strangle her, had pulled her hair, and had hit her.

17

Fifth, the sheriff's deputy who responded to the house after the shooting testified that Quintanilla told him that he had shot or killed Charlene.

Finally, the trial court heard testimony from an expert witness on the subject of domestic violence, Detective Christian Vaughn, who had listened to the testimony of the five earlier witnesses but did not know anything else about the case, including the facts surrounding the shooting, other than that Quintanilla had been charged with murder. Detective Vaughn explained that, in general, abusers often dissuade victims from reporting the abuse to law enforcement by exerting control and dominance in the relationship and by creating fear of harm in the victim, and that abusers also isolate victims to prevent the detection of abuse. Detective Vaughn testified that he had formed the opinion that Charlene's relationship with Quintanilla contributed to her reluctance to call law enforcement concerning the abuse. He explained that "everything that I heard was typical in my experience for some of the worst case domestic violence incidents. And I believe that the person described through the testimony was someone who had great fear for herself and her family members and she was in complete control by the abuser." On cross-examination, Detective Vaughn was asked about whether he believed Quintanilla killed Charlene to prevent her from going to the police.

> "Q. Is there anything about what you've heard in the testimony based upon your training and expertise where you can say as a certainty that [Charlene] was killed so that she wouldn't report the incidents to the police?
>
> "A. Conclusively, no. In its totality, as an opinion, I would say yes.
>
> "Q. When you say conclusively no, what do you mean by that?

18

"A. I don't have any facts about that specific day or that specific time. . . . So on that date, I don't know what was going on in that bedroom. But I said the totality based on what I heard about the ongoing abuse and the nature of the relationship, my opinion would be that that had to have been present, the intimidation and the fear and the act, if you will, of preventing the victim from telling anybody, especially the police, about the true nature of the abuse that was going on in that household.

"Q. So are you saying then it's your opinion that [Charlene] was killed so she wouldn't make a report that day?

"A. I can't say that conclusively."

After hearing the testimony and argument from counsel, the trial court ruled that Charlene's out-of-court statements were admissible under Evidence Code section 1390.

"[W]hen you look at the mountain of [Evidence Code section] 1109 evidence that was just presented under the guise of [Evidence Code section] 1390, it's actually reasonable that the intent was to keep her from testifying. She never said through any of these witnesses specifically anything about the defendant doing something to her specifically so that she wouldn't tell law enforcement, but she told these other individuals that she was afraid to make reports.

"Specifically, I think the first witness testified that she was afraid if she reported it, he would go to jail for a little while, get out, and hurt her more. So throughout all of these witnesses, the sentiment is sort of the same. That she's describing this culture, this environment which by its very nature is threatening and harming her to the point where she's afraid to report anything. And so, you know, I—ultimately it culminates in her dying at the hands of the defendant. So I think it's certainly a reasonable inference to make that this was done to keep her from saying anything at all about any of the abuse. Whether it was that day about what was going on that day or prior to, I think that it's absolutely a reasonable inference even though there might be 15 other reasonable inferences that don't go to that point, none of the authority says it must be to the exclusion of anything else. If that's one of the reasons among many, it's sufficient.

"So I also think that under [Evidence Code section] 1390[, subdivision] (b)(2) that the People have shown that this evidence is supported by independent corroborative evidence. The witnesses indicated

they saw the injuries themselves firsthand. So it's just not the unconfronted hearsay statements, but actually seeing the injuries themselves.

"Moreover under [Evidence Code section 1390, subdivision] (b)(4), I believe they also meet a sufficient level of trustworthiness and reliability given the sheer number of witnesses, the fact the witnesses are essentially describing either the same incident or similar incidents involving, you know, for example, the broken nose seem to be a theme that ran throughout at least a couple of witnesses, both indicating they saw that same type of injury, so the fact that the standard of proof is preponderance of the evidence I think is met, so I will allow in the statements under [Evidence Code section] 1390."

3. *Substantial Evidence Does Not Support the Trial Court's Finding That Quintanilla Killed Charlene, In Part, to Make Her Unavailable as a Witness*

Quintanilla argues that the trial court improperly admitted Charlene's out-of-court statements pursuant to Evidence Code section 1390 because insufficient evidence supports a finding that Quintanilla killed Charlene, at least in part, to prevent her from being a witness. As we will explain, we agree.

We begin with the observation that there was no evidence before the trial court during the in limine hearing about what occurred between Quintanilla and Charlene on the night of the shooting, other than that Quintanilla shot and killed Charlene in a bedroom in the house where they lived. Thus, to find that Quintanilla shot and killed Charlene, at least in part, to prevent her from being a witness against him, the trial court necessarily had to rely on an inference that because of how Quintanilla acted during earlier domestic violence incidents described by the witnesses, one of his motives in killing Charlene was to prevent her from being a witness. However, as we will explain, no substantial evidence supports such a finding.

20

For one thing, there was no pending proceeding against Quintanilla at the time of the killing, in which Charlene could have been a witness, and there was no evidence that Charlene had threatened to go to the authorities to initiate any such proceeding. Indeed, as the witnesses described, Charlene was reluctant to report Quintanilla to authorities because she loved him and because she was afraid of what he might do to her when he got out of jail. The only time that Charlene contacted the police, as described in Maria's testimony, was to get help in retrieving her belongings from Quintanilla's residence, and there is no indication that any proceeding was initiated against Quintanilla based on that contact with police or that Charlene wanted any such proceeding to be initiated.

Second, although, as the trial court observed, Quintanilla controlled and intimidated Charlene and did not want anyone to see the injuries he inflicted on her, it is also important there was no evidence that Quintanilla ever made any prior threats that he would kill Charlene if she went to the authorities or became a witness against him. The trial court described an "environment which by its very nature is threatening and harming [Charlene] to the point where she's afraid to report anything," based on which the court inferred that Quintanilla must have killed Charlene, at least in part, to prevent her from being a witness against him. However, with no evidence of a pending or threatened proceeding against Quintanilla where Charlene could be a witness, and no evidence that Quintanilla ever threatened to kill Charlene to prevent her from going to the authorities, it is wholly speculative to infer that Quintanilla killed Charlene, at least in part, to prevent her from being a witness merely because of the threatening and violent nature of the abusive environment created by Quintanilla.

21

Further, the testimony of Detective Vaughn did not provide substantial evidence for the trial court's finding that Quintanilla killed Charlene to prevent her from being a witness. " '[W]hen an expert bases his or her conclusion on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," the expert's opinion "cannot rise to the dignity of substantial evidence." ' " (*People v. Wright* (2016) 4 Cal.App.5th 537, 545.) As Detective Vaughn acknowledged, he knew nothing at all about the facts of the killing, other than that Quintanilla had been charged with murder. The most Detective Vaughn could say is that, based on the past instances of domestic violence, in his opinion, on the day of the shooting "that that had to have been present, the intimidation and the fear and the act, if you will, of preventing the victim from telling anybody, especially the police, about the true nature of the abuse that was going on in that household." Detective Vaughn was then asked whether, in his opinion, "[Charlene] was killed so she wouldn't make a report that day." He answered, "I can't say that conclusively." Thus, although Detective Vaughn opined that control, fear and intimidation was present in the relationship between Charlene and Quintanilla, his testimony provides no basis for the trial court's inference that Quintanilla killed Charlene, at least in part, to prevent her from being a witness.

Sparse case law exists applying the requirements of Evidence Code section 1390 or the analogous constitutional doctrine of forfeiture by wrongdoing doctrine in the context of domestic violence cases. The only published case to apply Evidence Code section 1390 in a domestic violence context where the defendant killed the declarant is *Kerley*, *supra*, 23 Cal.App.5th 513. In *Kerley* the decomposed body of the defendant's

22

girlfriend was found in a remote area. (*Id*. at pp. 523-524) The issue at trial was whether the defendant killed her. (*Id*. at p. 528.) At trial, the court admitted extensive testimony about domestic violence between the defendant and his girlfriend (*id*. at pp. 521, 533-535), as well as statements that the girlfriend made to police officers on two occasions when they responded to domestic violence calls (*id*. at pp. 522, 544-546), and out of court statements about the domestic violence that the girlfriend made to friends, family and other third parties. (*Id*. at pp. 560-562.)

As relevant here, *Kerley* concluded that the trial court properly admitted the girlfriend's out-of-court statements because they were admissible under Evidence Code section 1390 (*Kerley*, *supra*, 23 Cal.App.5th at p. 563), and although some of the statements to the police officers were testimonial, their introduction was not barred by the Confrontation Clause because the forfeiture by wrongdoing doctrine applied. (*Id*. at p. 559.) Reviewing the evidence, the court focused on the following facts: "Kerley isolated [his girlfriend] from family and friends to keep her from seeking outside help; discouraged her from calling the police, reporting her abuse to authorities, or cooperating in a prosecution; and knew she was a likely witness in his pending felony prosecution for beating her up on January 7, 1996." (*Id*. at p. 556.) Further, Kerley "kept [his girlfriend] from seeing her family and friends. Kerley clearly communicated to [his girlfriend] that, if she called the police, he would kill her. Kerley was facing felony domestic violence charges for assaulting [his girlfriend] and had an impending court date when she disappeared. [Kerley's girlfriend] obviously would have been the key witness against him." (*Id*. at p. 557.) The court therefore concluded that "[s]ubstantial evidence supports

23

the trial court's implied finding that Kerley murdered [his girlfriend] at least in part to keep her from reporting him to the police and testifying against him in his pending domestic violence case." (*Id.* at p. 559.)

Thus, in *Kerley* the application of Evidence Code section 1390 turned on two crucial facts that are not present in this case: (1) there was a pending domestic violence case against the defendant with an upcoming court date; and (2) the defendant had threatened to kill his girlfriend if she called the police. Here, in contrast, there was no pending proceeding against Quintanilla in which Charlene might be a witness, no indication that Charlene planned to go to the authorities to initiate any such proceeding, and no evidence that Quintanilla had ever threatened to kill Charlene if she reported him to authorities.

In *People v. Banos* (2009) 178 Cal.App.4th 483 (*Banos*), which was decided before the enactment of Evidence Code section 1390, the court applied the forfeiture by wrongdoing doctrine in a domestic violence case resulting in murder. In *Banos*, the defendant was convicted of murdering his ex-girlfriend, after he admitted to killing her by breaking into her home and hitting her in the head with a hammer. (*Id*. at pp. 485, 490.) *Banos* held that testimonial out-of-court statements by the ex-girlfriend to police officers about the defendant's domestic abuse were admissible under the forfeiture by wrongdoing doctrine because the evidence supported a finding that the defendant killed his ex-girlfriend to prevent her from cooperating with authorities and testifying in court. (*Id*. at p. 502.) In the 10 months prior to the killing, defendant was arrested three times based on the ex-girlfriend's complaints to police. (*Id*. at p. 486.) The court explained,

"At the time of [the ex-girlfriend's] death, there was pending a hearing on defendant's violation of the restraining order. That defendant killed [the ex-girlfriend] to stop her from testifying against him at the hearing is supported by evidence that he was arrested multiple times at [the ex-girlfriend's] apartment by police responding to a call about violation of a court order and domestic violence. The trial court reasonably could have found that defendant knew he would be prosecuted for these actions and that [the ex-girlfriend] would testify at those proceedings. Substantial evidence also supports the implied finding that once defendant broke into [the ex-girlfriend's] home on April 10th [where he killed her on that day], he knew that criminal proceedings would be commenced and as she had cooperated with the police before, [the ex-girlfriend] was likely to testify at those proceedings." (*Id*. at p. 503, fn. omitted.) Further, explaining the evidence supported a finding that the defendant killed the ex-girlfriend to prevent her from reporting his abuse of her to the authorities, the court stated, "[t]hat defendant killed [the ex-girlfriend] to stop her from reporting his assaultive behavior to the police can reasonably be inferred from the statements defendant is heard making on the tape of [the ex-girlfriend's] June 7, 2003, call to 911, as to which there is no evidentiary challenge: 'Do you want to speak to the police?' 'Are you going to talk?' 'Are you going to speak with the cops? Are you going to speak?' " (*Id*. at p. 502.) Thus, as in *Kerley*, the court in *Banos* focused on (1) the existence of legal proceedings against the defendant; and (2) the defendant's threats that the victim should not speak with authorities. As we have explained, no such evidence exists in this case.

25

Finally, we note that in the context of the forfeiture by wrongdoing doctrine the Supreme Court in *Giles* acknowledged that killings occurring in the context of a relationship involving domestic violence might give rise to an inference that the killing was committed to prevent the victim from going to the authorities or being a witness. Both *Banos* and *Kerley* relied on that discussion when conducting their analysis of whether substantial evidence supported a finding regarding the defendant's intent. (*Kerley*, *supra*, 23 Cal.App.5th at pp. 550, 557; *Banos*, *supra*, 178 Cal.App.4th at pp. 501-502.) Further, the People in this case cited the *Giles* language to support their motion in limine to introduce Charlene's out-of-court statements under Evidence Code section 1390. Here, however, *Giles* does not support the trial court's finding because *Giles* calls out certain types of evidence that is *not* present in this case. As *Giles* explained, "Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution . . . . Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (*Giles*, *supra*, 554 U.S. at p. 377.) Here, although the evidence shows that Quintanilla sought to isolate Charlene, control her, and create fear in her, there is no specific evidence of abuse or threats of abuse "intended to dissuade the victim from resorting to outside help" or "evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (*Ibid*.) All that we are left with is evidence that is unquestionably

26

present in many domestic violence cases, namely that Charlene and Quintanilla's relationship was violent and included elements of control, isolation and fear. That evidence, without more, is insufficient to satisfy the intent requirement of Evidence Code section 1390.

In enacting Evidence Code section 1109, which allows the introduction of propensity evidence in a prosecution for domestic violence, the legislative history points to the Legislature's concern with domestic violence that could escalate to the point that the defendant kills the victim. "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, pp. 3-4.)" (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028.) Several years later, in enacting Evidence Code section 1390, the Legislature could have acted upon its awareness that domestic violence can culminate in a killing of the victim

27

by providing an exception to the hearsay rule in *any* domestic violence case where the defendant kills the declarant.[9]  If the Legislature had done so, a great range of evidence of the defendant's past domestic violence against the victim would be admissible in *any* murder trial involving domestic violence.  However, the Legislature did not chose that approach in enacting Evidence Code section 1390.  Instead, Evidence Code section 1390 requires the trial court to find that the defendant *intended* to procure the unavailability of the victim as a witness as a prerequisite to admission of the victim's out-of-court statements under that provision.  As we have explained, substantial evidence does not support a finding in this case that Quintanilla killed Charlene with the intent, at least in part, to make her unavailable as a witness.  The trial court therefore abused its discretion in admitting Charlene's out-of-court statements under Evidence Code section 1390.

4.      *The Error Was Prejudicial*

As the parties agree, the trial court's erroneous admission of evidence pursuant to Evidence Code section 1390 requires reversal of the judgment only if the error was

---

[9]      We note that in *Giles*, Justice Scalia's majority opinion responded to the dissent's observation that it "would be particularly helpful to women in abusive relationships—or at least particularly helpful in punishing their abusers" if the court adopted a forfeiture by wrongdoing doctrine that did not require that the defendant act with the purpose of preventing the witness from testifying. (*Giles*, *supra*, 554 U.S. at p. 376.)  As Justice Scalia noted, "since only *testimonial* statements are excluded by the Confrontation Clause" "[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules, which are free to adopt the dissent's version of forfeiture by wrongdoing." (*Ibid*.)  In drafting Evidence Code section 1390, which was enacted subsequent to *Giles*, the Legislature could have, but did not, follow Justice Scalia's suggestion that drafters of hearsay rules could omit the intent requirement in codifying the forfeiture by wrongdoing hearsay exception.

prejudicial under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Under that standard, we determine whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. (*Ibid.*) There is a reasonable probability of a more favorable result when there exists "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result." (*Watson*, at p. 837.) Under this standard, "review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)

Our analysis of whether the erroneous admission of Charlene's out-of-court statements requires us to reverse the judgment necessarily focuses on the impact that the erroneously admitted evidence may have had on the disputed issues at trial. The jury found that Quintanilla was guilty of first degree murder, and thus that when he shot Charlene, he acted "willfully, deliberately and with premeditation." (CALCRIM No. 521.) We must therefore determine whether it is reasonably probable, that absent the erroneous admission of Charlene's out-of-court statements under Evidence Code

29

section 1390, the jury would not have found Quintanilla killed Charlene willfully, deliberately and with premeditation.[10]

In analyzing whether it is reasonably probable that the improperly admitted evidence impacted the jury's finding on premeditation and deliberation, we keep in mind the instruction that the jury was given regarding first degree murder, CALCRIM No. 521, which states, in relevant part: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if he decided to kill before completing the act[s] that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

---

10     Of course, the improperly admitted evidence was also relevant to the issue of express or implied malice needed for a conviction of either first or second degree of murder. (§ 188.) However, because establishing premeditation and deliberation for first degree murder is generally more difficult than establishing express or implied malice, we focus our harmless error analysis on the issue of premeditation and deliberation.

30

As we have described, there was little evidence presented at trial as to what occurred between Quintanilla and Charlene on the night of the shooting, as the only witness was the Child, who provided only a limited and disjointed description. Thus, to determine how and why Quintanilla shot Charlene, and accordingly whether he was guilty of first degree murder, the jury was required to focus on (1) the forensic evidence, including the weapon that Quintanilla used; (2) Quintanilla's actions and statements after the shooting; and (3) the history of the interactions between Quintanilla and Charlene.

The forensic evidence by itself was not sufficient to support a finding that Quintanilla acted with premeditation and deliberation. The evidence suggested that Quintanilla shot Charlene at the relatively close range of five to 10 feet, that Charlene was lying on the bed when she was shot, that Quintanilla shot Charlene in the chest, and that Quintanilla used a shotgun that had to be manually pumped to load a round into the chamber. However, these facts alone do not indicate whether Quintanilla made a decision to kill "rashly, impulsively, or without careful consideration" or, on the other hand, whether he made "a cold, calculated decision to kill." (CALCRIM No. 521.) There was no evidence at trial as to when Quintanilla brought the shotgun into the bedroom, or whether he took it out of a case.[11] There is also no evidence about when the shotgun was loaded. Quintanilla may have pumped the shotgun to load a round into the chamber and taken that time to reflect on what he was about to do, but he may also have hastily pumped the shotgun before shooting Charlene and quickly aimed at her chest

_____

[11] An empty soft-sided gun case, which was long enough to hold the shotgun used in the shooting, was found in the closet of the bedroom where the shooting occurred.

from a range of five to 10 feet, without any premeditation and deliberation. Further, Quintanilla might have stored the shotgun with a round already loaded in the chamber and thus could have been able to quickly and impulsively pull the trigger without any additional time to reflect. Indeed, when deputies located the shotgun after the shooting where Quintanilla had placed it, it was ready to be shot, with a round already loaded in the chamber.

As for Quintanilla's actions after the shooting, the evidence showed that Quintanilla manually expelled the expended round onto the bed near Charlene at some point after the shooting; he moved the shotgun outside the house at some point; he waited more than a day before contacting authorities about the shooting, which he first attempted to do by making false 911 calls; and he ultimately told authorities that he shot or killed Charlene. Quintanilla's delay in reporting the shooting and other strange behavior after the killing could be interpreted as showing a lack of remorse, upon which a juror could rely, along with other evidence, to infer that Quintanilla acted with premeditation and deliberation in killing Charlene. On the other hand, Quintanilla's delay in reporting the killing could just as reasonably be viewed as evidence that Quintanilla was in a state of denial, panic or shock because he had rashly and impulsively killed Charlene without considering the consequences. We accordingly conclude that evidence of Quintanilla's actions after the shooting do not strongly support a finding that Quintanilla acted with premeditation and deliberation in committing the killing rather than acting rashly and impulsively.

Because neither the forensic evidence nor Quintanilla's actions after the shooting provide strong evidence of premeditation and deliberation, it is likely that the jury heavily relied on the third category of evidence to determine Quintanilla's state of mind during the shooting, namely the history of the interactions between Quintanilla and Charlene, with a particular focus on any past instances in which Quintanilla inflicted domestic violence on Charlene under circumstances showing that he hurt her in a deliberate and premeditated manner. We therefore turn to an examination of whether it is reasonably probable that if the jury heard only *admissible* evidence of Quintanilla's prior domestic violence toward Charlene, the jury would not have been able to find beyond a reasonable doubt that Quintanilla acted with premeditation and deliberation in shooting Charlene.

As an initial matter, we note that although Charlene's out-of-court statements were not admissible under Evidence Code section 1390, some of them nevertheless would be admissible under a different exception to the hearsay rule. "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.) Under Evidence Code section 1240, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) "To apply the exception . . . ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been

33

before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Lucas* (2014) 60 Cal.4th 153, 269, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1.)

Here, Quintanilla does not dispute that one statement Charlene made to Maria was admissible as a spontaneous statement under Evidence Code section 1240 because it was made under the stress of excitement of the incident. Specifically, Maria testified that Charlene arrived at her house in pajamas and bare feet immediately after Quintanilla had strangled her, and Charlene was crying and upset as she described the incident. Charlene stated that the strangling had occurred in the bedroom, that she was scared, couldn't breathe, felt like she might pass out, and she struggled to get away. The People also identify another statement by Charlene that was admissible as a spontaneous statement. Specifically, when Sister saw Charlene with a crooked nose and swollen face at the gate, Charlene was upset and crying as she told Sister that Quintanilla had hit her and would not let her open the gate. We agree that this statement is admissible under Evidence Code section 1240. Therefore, in conducting our harmless error analysis, we include as part of the properly admitted evidence (1) Charlene's out-of-court statement to Maria

34

about the strangling; and (2) Charlene's out-of-court statement to Sister about Quintanilla hitting her.[12]

The properly admitted evidence also included testimony about the domestic violence perpetrated by Quintanilla that the witnesses personally perceived. First, Maria saw Charlene with black eyes and a crooked nose. Second, Andrea saw bruises on Charlene's arms that looked like they were caused by fingertips, and she saw bruising on Charlene's nose. Third, Sister saw a bruise mark on Charlene's back. Fourth, Mother saw a red mark on Charlene's neck when Charlene was complaining of her throat hurting. Finally, during arguments, Quintanilla hit his former girlfriend in the head and ripped a purse off of her arm.

Unquestionably, all of the properly admissible incidents of domestic violence portray Quintanilla as someone with a propensity to inflict serious physical injury. Crucially, however, what is missing from the admissible evidence is any evidence from which it is reasonable to infer that Quintanilla had a propensity to inflict physical injury that was not merely the result of rash and impulsive anger, but instead the result of a

---

[12] The People make a vague and undeveloped argument that some of Charlene's out-of-court statements were also admissible under Evidence Code section 1251, a hearsay exception that applies to "evidence of a statement of the declarant's state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) at a time prior to the statement" when "[t]he evidence is offered to prove such prior state of mind, emotion, or physical sensation when it is itself an issue in the action and the evidence is not offered to prove any fact other than such state of mind, emotion, or physical sensation." (Evid. Code, § 1251.) However, the People do not develop the argument, and we are unable to identify any of Charlene's out-of-court statements that would be admissible under Evidence Code section 1251.

deliberate and considered decision to inflict harm. However, two incidents that were improperly admitted into evidence based on Charlene's out-of-court statements do provide evidence of Quintanilla's infliction of domestic violence under circumstances where he had ample opportunity to reflect and act deliberately. First, both Aunt and Sister testified about an incident in which Quintanilla tied Charlene to a chair, put duct tape on her mouth and a bag over her head, poured gasoline on her, and then lit a lighter.[13] Charlene said that she thought she was going to die, and explained that she was saved only because Quintanilla's mother intervened. Second, both Aunt and Mother testified about Quintanilla using a belt to strangle Charlene. According to Aunt, Charlene lost consciousness during the incident, and according to both Aunt and Mother, Charlene was able to get away only because Quintanilla's stepfather intervened.[14]

There can be no doubt that the act of tying up Charlene, putting a bag over her head, pouring gasoline on her and then lighting a lighter involved a drawn-out process during which Quintanilla was able to reflect and deliberate on the dangerous, cruel and deadly nature of his actions. Similarly, Quintanilla's act of getting a belt, putting it

---

[13] The Child may have described some of this same incident when she stated that Quintanilla had tied Charlene's legs and put tape on her hands. However, the Child's description left out some of the most crucial details to show Quintanilla's cruel, deliberate and deadly course of action, namely the bag over Charlene's head, the gasoline, and the lighting of the lighter.

[14] Although the admissible evidence included a statement by Charlene to Maria that Quintanilla had strangled her, there was no indication that Quintanilla used a belt rather than his hands, and Charlene did not say that she lost consciousness. Accordingly, the strangling that Charlene described to Maria is not evidence that Quintanilla engaged in a deliberate and drawn-out course of conduct that lasted long enough for Quintanilla to premeditate and deliberate rather than committing a rash and spontaneous act.

36

around Charlene's neck, and then pulling on it until she lost consciousness also involved a course of conduct during which Quintanilla had a chance to reflect on the deadly nature of what he was doing. Indeed, "[l]igature strangulation is in its nature a deliberate act." (*People v. Bonillas* (1989) 48 Cal.3d 757, 792), and case law holds that killing a victim by strangulation shows the type of premeditation and deliberation necessary to support a conviction for first degree murder. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 11 ["where strangulation occurs over a prolonged period of time, a rational juror could find that the killer committed a premeditated and deliberate murder"]; *People v. Hovarter* (2008) 44 Cal.4th 983, 1020 [the prolonged manner of a murder by strangling "affords ample time for the offender to consider the nature of his deadly act"].)

As we have explained, it is not clear what happened between Quintanilla and Charlene on the night of the shooting. Further, the forensic evidence of the crime scene and the evidence of Quintanilla's actions after the shooting do not provide strong evidence as to Quintanilla's state of mind during the killing. Because the belt-strangulation incident and the gasoline incident were the only incidents of domestic violence that demonstrated Quintanilla's propensity for perpetrating deliberate, considered and deadly violence against Charlene rather than acting rashly and impulsively, it is likely that those two incidents were central to the jury's deliberation on the issue of whether it could conclude, beyond a reasonable doubt, that Quintanilla acted with premeditation and deliberation in killing Charlene. We therefore conclude that it is reasonably probable that the jury would not have convicted Quintanilla of first degree

37

murder if testimony about the belt-strangulation incident and the gasoline incident were not admitted into evidence at trial.

The evidence makes clear that Quintanilla had a long history of engaging in violent and reprehensible conduct toward Charlene that culminated in a brutal and tragic killing.  However, even a defendant charged with a horrific crime like Quintanilla's has the right to a fair trial where the rules of evidence are properly applied.  Because we conclude it is reasonably probable that Quintanilla would have obtained a more favorable result at trial on the issue of premeditation and deliberation had the trial court excluded Charlene's out-of-court statements from evidence, we reverse the judgment and remand this action for further proceedings consistent with our opinion.[15]

## DISPOSITION

The judgment is reversed, and this matter is remanded for further proceedings.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

---

[15] Because we reverse the judgment, we need not, and do not, reach the other issues raised in Quintanilla's appeal.

38